# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

Victoria Sanford,          )    Civil Action No.  5:18-cv-2886-KDW
                                )
              Plaintiff,     )
                                )
vs.                               )
                                )          ORDER
Andrew M. Saul, Commissioner of    )
Social Security,[1]                )
                                )
              Defendant.    )

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").

Having carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision for the reasons discussed herein.

I.      Relevant Background

     A.      Procedural History

On December 19, 2014,[2] Plaintiff filed an application for DIB alleging a disability onset

date of December 3, 2013. Tr. 194-95. Her claim was denied initially, Tr. 94, and upon

reconsideration, Tr. 115, and Plaintiff requested a hearing, Tr. 132-33. On March 30, 2017, a

hearing was held before an Administrative Law Judge ("ALJ") and testimony was taken from

---

[1] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this action. See 42 U.S.C. § 405(g), Fed. R. Civ. P. 25(d).

[2] Although the Application Summary is dated January 15, 2015, and refers to an application date of December 23, 2014, Tr. 194, based on the Disability Determination and Transmittal, Plaintiff's protected filing date is December 19, 2014, Tr. 94.

Plaintiff, who was represented by counsel, and from a vocational expert ("VE"). Tr. 46-80. On September 22, 2017, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 22-40. Plaintiff requested review of the decision from the Appeals Council, Tr. 192-93, and after granting Plaintiff's request for additional time to submit materials, Tr. 10, the Appeals Council denied review on September 5, 2018, making the ALJ's decision the Commissioner's final decision for purposes of judicial review, Tr. 1-5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed October 25, 2018. ECF No. 1.

B.      Plaintiff's Background

Born in May 1967, Plaintiff was 46 years old on her alleged onset date of December 3, 2013. Tr. 207. In her initial Disability Report-Adult form Plaintiff noted that she completed the 12th grade, did not attend special education classes, and had not completed any type of specialized job training or vocational school. Tr. 211. She listed her past relevant work ("PRW") as store manager and beauty store sales. *Id.* Plaintiff indicated that she stopped working on December 3, 2013, because of her medical conditions, which she listed as: "obese, depression, anxiety, hearing loss 80%, high blood pressure, water pills, blind without glasses, bad arthritis, [and] water on right knee need knee replacement." Tr. 210. Plaintiff indicated that she was 5'2" tall and weighed 336 pounds. *Id.*

In a May 18, 2015 Disability Report-Appeal, Plaintiff indicated a change in her medical condition and noted that she was going to a weight loss doctor. Tr. 229. She also noted that she had obtained a "handicap tag." Tr. 232. In a subsequent Disability Report-Appeal dated September 22, 2015, Plaintiff indicated a change in her medical condition that occurred in August 2015. Tr. 245. Plaintiff noted: "Right knee and right shoulder are getting worst [sic]. I can not have any more injection I have to ambulate with a cane, I am falling more (out the shower and now I have handicap

bar in the shower and now I have a chair to sit in the shower) I am more depressed because I can not do much of any anything." *Id.* Regarding changes in her activities Plaintiff indicated that she is "falling more." Tr. 248.

C.    Administrative Proceedings

Plaintiff appeared with counsel in Augusta, Georgia for her administrative hearing on March 30, 2017. Tr. 46. VE Robert Brabham, Jr. also appeared and testified. *Id.* In his opening statement, Plaintiff's counsel suggested that Plaintiff's impairment of "profound hearing loss" may meet a Listing and he also noted her "significant musculoskeletal issues, specifically with her obesity affecting her knees and the right shoulder." Tr. 50-51. Counsel also pointed the ALJ to the place in the record (Exhibit 15F, page 4) where in June 2015 Plaintiff was prescribed a cane. Tr. 51.

1.   Plaintiff's Testimony

In response to questions from the ALJ Plaintiff stated that she lived with her husband and father-in-law, was 5'2" tall, and weighed 315 pounds. Tr. 53. Plaintiff testified that she last worked at Atlas Express as a full-time convenience store manager from 2010 through 2013. Tr. 53-54. Plaintiff also stated that she worked part-time for CosmoProf as cashier and she stocked beauty supplies. Tr. 54. Plaintiff testified that she stopped working at CosmoProf because she could not stand due to leg pain. *Id.* The ALJ noted that Plaintiff was below substantial gainful activity ("SGA") in 2011. Tr. 55. Plaintiff confirmed that she worked for Howard Enterprises at Huntsman Shell convenience store from 2003 to 2006 as a manager. Tr. 55-56. Plaintiff testified that she was able to hire and fire employees, did scheduling, worked as a cashier, and stocked shelves. Tr. 56. Plaintiff stated that in that job she lifted and carried at least 50 pounds at one time. Tr. 56-57. Plaintiff testified that in 2001 she worked as an assistant manager at Speedway. She did not hire

or fire employees, but she did cashier work, stocked shelves, and lifted and carried 50 pounds. Tr. 57.

Plaintiff stated that she was "adjusting" to using the cane and was able to walk around using only one cane. Tr. 57. Plaintiff stated that she could walk about 30 feet and if she needed to walk farther she would "sit down and take me a break." *Id.* Plaintiff testified that she does not go to the grocery store because it "hurts [her]." Tr. 58. Plaintiff stated that she did not have hearing aids because she was told it would not help much, but she stated that she wore them when she was younger. *Id.* Plaintiff testified that her hearing is getting worse. *Id.* The ALJ noted that Plaintiff was wearing glasses and Plaintiff testified that her eyes "are getting worse" and her vision was a "little bit fuzzy." Tr. 58-59. Plaintiff stated that she only drives about twice a month to go to the doctor. She testified that she does not drive more often because she cannot hear sirens or other cars. Tr. 59. Plaintiff stated that she is able to do "a little bit" of dishes, vacuuming, and laundry, and her husband does the rest. Tr. 59-60. Plaintiff stated that she is able to attend to her personal hygiene, but her husband has to help her shave and get dressed because she cannot lift her right arm. Tr. 60. Plaintiff testified that she cannot lift her right arm above shoulder level, but she is able to lift her left arm. Tr. 60-61. Plaintiff testified that her right hand is "weak" and stated that she is left-handed. Tr. 61. Plaintiff testified that she could sit in one place for 30 minutes before needing to get up and move around and stretch because her back and legs hurt. *Id.* She stated that she could stand for about 10 minutes before needing to sit down. *Id.* Plaintiff stated her anxiety was "so-so" and testified that she took an anxiety pill before coming to the hearing because she was nervous. Tr. 61-62. Plaintiff stated that with her anxiety and depression she has good days and bad days and on bad days she cries a lot. Tr. 62. Plaintiff confirmed that in September 2016 she went to the hospital because she had a "bad day" and attempted to hurt herself. Tr. 62-63. Plaintiff stated that

she has not had those kinds of feelings since then. Tr. 63. Plaintiff stated that doctors closed her case because she was put on a lot of medication that caused her to sleep so much that she missed therapy appointments. *Id.* Plaintiff testified that her doctor has given her a referral and she will start seeing someone again. *Id.* Plaintiff stated that she was taking medications for her depression and anxiety that are helping. *Id.*

In response to questions from her attorney Plaintiff confirmed that she has pain in her knees every day and her right knee is the worst. Tr. 63-64. Plaintiff stated that it "locks up" and she has fallen. Tr. 64. Plaintiff testified that she has had knee problems a "long time" and it started when she was working at the convenience stores. *Id.* Plaintiff stated that she has had problems with her right shoulder for "about four or five years now." *Id.* Plaintiff confirmed that she has been using the cane since the nurse practitioner prescribed it and the cane helps her with balance. *Id.* When asked how she was able to work with her hearing loss Plaintiff testified: "I survived. I just had to do what I have to do." *Id.* Plaintiff stated that she feels her hearing loss is getting worse and she has discussed it with her doctor. Tr. 64-65. Plaintiff confirmed that doctors talked to her about cochlear implants; however, Plaintiff stated that she did not know if she would like to have them and did not know what they were. Tr. 65. Plaintiff stated that she uses the cane all the time. *Id.* She testified that she experiences medication side effects of drowsiness, nausea, diarrhea, and constipation. *Id.* She stated her migraine medication, depression medication (Effexor), her anxiety medication, and pain medication (Norco) causes drowsiness. Tr. 65-66. Plaintiff stated that she is drowsy every day when she takes her pain medication, and she takes it once every 12 hours. Tr. 66. Plaintiff testified that, other than pain medications, she also uses ice on her back, knees, and shoulder, and she uses a heating pad on her knee and shoulder. *Id.* Plaintiff stated that the heat and

ice help and she uses them every day. *Id.* Plaintiff testified that she rests for about four hours every day because her legs swell so she elevates them. Tr. 67.

The ALJ resumed questioning and asked Plaintiff if she had any problems lifting her right arm out straight or out in front. Tr. 67. Plaintiff stated she had no problems and demonstrated. The ALJ noted that she was lifting her arm at "about hip level." *Id.*

### 2. VE's Testimony

The ALJ identified Plaintiff's past work at Huntsman Shell and Speedway as Plaintiff's only PRW and asked the VE to describe those jobs in vocational terms. Tr. 69. The VE noted that the jobs fell under the same title in the Dictionary of Occupational Titles ("DOT") and the DOT did not differentiate between manager and assistant manager positions. *Id.* The VE testified that the position of retail manager is classified in the DOT as skilled work generally performed at the light exertional level, with an SVP of 7, and DOT number 185.167-046. *Id.* The VE testified that given Plaintiff's testimony regarding her job duties, she sometimes performed work as a stock clerk, which is classified as heavy exertional level work. *Id.* The VE confirmed that Plaintiff's work was a composite job and the stock clerk position was classified as semi-skilled, heavy, SVP of 4, and DOT number 299.367-014. Tr. 69-70.

The ALJ noted that Plaintiff was 49 years old with a high school or greater education. Tr. 70. The ALJ asked the VE to assume a hypothetical individual with the same age, education, and PRW as Plaintiff with the following residual functional capacity ("RFC"):

> She can lift no more than 10 pounds at a time with occasional lifting and carrying articles, for example docket files, ledgers, or small tools. She can sit for six hours in an eight-hour shift. She could stand and/or walk for two hours in an eight-hour shift, provided that she can alternate to standing for up to 10 minutes after 30 minutes of sitting.
> She can occasionally reach overhead and all other directions on the right. Handling and fingering objects would be frequent on the right. She can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds. She can occasionally

balance, stoop, kneel, crouch, and crawl. She can have no work [that] requires far acuity and no work involving clear verbal skills, such as telephone use. She can have moderate exposure to noise. And her jobs would have to be limited to simple, routine tasks.

*Id.* The ALJ asked if an individual with those limitations could perform Plaintiff's PRW as actually performed or as customarily performed per the DOT. Tr. 70-71. The VE responded in the negative. Tr. 71. The VE identified the following jobs the individual could perform with those limitations: assembler, sedentary, unskilled, SVP of 2, DOT number 739.684-094, excess of 350,000 positions nationally; machine tender, sedentary, unskilled, SVP of 2, DOT number 731.685-014, excess of 275,000 positions nationally; and bench hand or packer, sedentary, unskilled, SVP of 2, DOT number 715.684-026, excess of 84,000 positions nationally. *Id.* The VE confirmed that his testimony was in accordance with the DOT but noted that the DOT "does not specifically address a sit-stand option, either way, and would also not break down those reaching restrictions for one hand versus bilaterally." *Id.* The VE stated that those portions of his testimony were based on his over 18 years of experience in the field of rehabilitation counseling. Tr. 72.

Plaintiff's counsel asked the VE to define clear verbal skills. Tr. 72. The VE stated that he interpreted that to be "jobs that would require communication as an essential job function - - talking on a regular basis, dealing with customers, dealing with the public, as the judge said, using the telephone on a regular basis." *Id.* Counsel asked if a person who "does not have the ability to understand or hear normal voices, normal commands, normal instructions" could do the jobs of assembler, machine tender, and bench hand. *Id.* The VE testified that "[i]f someone is not able to hear to the point that they cannot be trained to do those simple one- to two-step tasks, then, certainly, that would be problematic in the work setting. But those aren't going to be jobs that require ongoing communication on a regular basis." *Id.* Counsel asked how the jobs would be affected if the person is unable to hear instructions or commands unless reading lips. Tr. 73. The

VE responded that beyond the training period or learning the tasks, he did not believe the effect would be substantial. *Id.* The VE testified that the ability to hear would not be an essential function and that those jobs did not require ongoing communication. *Id.* The VE noted that there would be interaction with supervisors. *Id.* Plaintiff's counsel asked if the jobs would allow for use of a cane for standing and ambulation. Tr. 73-74. The VE testified that "if an individual needs a sit-stand option and would need a cane when standing, at the sedentary level, you're taking one whole hand completely out of play. That would be substantial and eliminate those positions." Tr. 74. Plaintiff's counsel asked how the ability to do the jobs would be affected if the person was off task due to pain or medication side effects for 20 percent of the day. *Id.* The VE testified that was "excessive in terms of normal, allowable off-task time or break time. It would not be consist[ent] with gainful employment." *Id.* Counsel asked how the jobs would be affected if the person "would miss three or more days a month, due to psychological problems, mental impairments, [or] physical problems." Tr. 74. The VE stated that also would be considered excessive in terms of allowable absenteeism and inconsistent with gainful employment at any skill or exertional level. *Id.*

The ALJ resumed questioning of the VE and asked if there would be any jobs available if he added to his first hypothetical that the person would need to use a handheld assistive device for all ambulation, but not for standing. Tr. 74-75. The VE testified that would not have an impact on the positions he identified in response to the first hypothetical. Tr. 75. There were no further questions for the VE from either the ALJ or Plaintiff's counsel. *Id.*

In closing, Plaintiff's counsel again cited to Plaintiff's difficulty hearing but conceded he was unable to interpret the audiograms. Tr. 75. Citing to Exhibit 5F at page 16, counsel noted that x-rays showed severe arthritis in Plaintiff's shoulder and he confirmed there were no x-rays of Plaintiff's knees. Tr. 75-76. However, counsel cited to an October 2013 exam (Exhibit 15F, page

6) that indicated Plaintiff was having difficulty ambulating, and there was "clicking, popping, and the knees giving way." Tr. 77. He also noted that Plaintiff had a knee injection. *Id.* The ALJ stated that he did not doubt Plaintiff had knee problems and that, combined with her obesity, was the reason his RFC assessment was at the sedentary level. *Id.* Counsel argued that Plaintiff would not be able to be on her feet two hours a day, five days a week, but conceded that he had no objective documentation or physician's opinion to support that argument. Tr. 78.

II.     Discussion

A.     The Commissioner's Findings

In his September 22, 2017 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant last met the insured status requirements of the Social Security Act on March 31, 2015.
>
> 2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 3, 2013, through her date last insured of March 31, 2015 (20 CFR 404.1571 *et seq.*).
>
> 3.     Through the date last insured, the claimant had the following severe impairments: major joint dysfunction of the knees and right shoulder, obesity, loss of central visual acuity, hearing loss, depressive disorder, and anxiety disorder (20 CFR 404.1520(c)).
>
> 4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.     After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity of: can lift no more than 10 pounds at a time; with occasional lifting or carrying articles, for example, docket files, ledgers, or small tools; can sit for six hours in an eight-hour shift; can stand and/or walk for two hours out of an eight-hour shift; with alternating to standing for up [to] 10 minutes after 30 minutes of

sitting; can occasionally reach overhead and all other directions on the right; handling and fingering objects frequently on the right; can occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; no work requiring far acuity; not work involving clear verbal skills such as telephone use; with moderate exposure to noise; and jobs limited to simple routine tasks.

6.     Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on May 17, 1967, and was 47 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 3, 2013, the alleged onset date, through March 31, 2015, the date last insured (20 CFR 404.1520(g)).

Tr. 27, 33, 35, 38-39.

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.   Analysis

Plaintiff alleges the ALJ committed reversible error (1) by failing to consider the side effects of her medications, (2) by not including all of her limitations in the RFC, (3) by failing to properly account for her bilateral hearing loss in formulating her RFC, and (4) by failing to properly and adequately evaluate her mental impairments and limitations. Pl.'s Br. 3, ECF No. 16.

1.   Consideration of Medication Side Effects

Plaintiff argues that nowhere in his decision does the ALJ "consider, mention or evaluate the Plaintiff's medications *and* . . . the complete effect those medications have on her." Pl.'s Br. 12 (emphasis in original). Plaintiff noted her testimony that she has medication side effects that include drowsiness, nausea, diarrhea, and constipation and argues the ALJ did not follow the regulations regarding the need to consider this evidence when making his RFC assessment. *Id.* at

12-13. The Commissioner asserts that the "ALJ considered Plaintiff's testimony about side effects, but it was Plaintiff's burden to demonstrate that her medication side effects significantly limited her ability to perform basic work activities [and] [s]he did not meet that burden." Def.'s Br. 7, ECF No. 17.

Social Security Ruling 16-3p[4] provides guidance on the evaluation of a claimant's symptoms in a disability case. The Ruling notes that "[i]n addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms" the ALJ should also consider factors set forth in the regulations, including the "type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms[.]" 2016 WL 1119029 at *7 (citing 20 C.F.R. § 404.1529(c)(3)). The court notes, though, that ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision. *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection"

---

[4] SSR 16-3p superseded SSR 96-7p on March 16, 2016. In a subsequent revisionary notice, the SSA clarified that "adjudicators will apply SSR 16-3p when we make determinations and decisions on or after March 28, 2016. When a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review." SSR 16-3p, 2017 WL 5180304 at *1. Because the ALJ rendered his decision in this case on September 22, 2017, SSR 16-3p is the applicable Ruling.

insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole).

In support of his RFC assessment the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." Tr. 35-36. The ALJ discussed Plaintiff's testimony from the administrative hearing noting the "claimant stated she has medications side-effects of drowsiness, nausea, diarrhea, and constipation. The claimant stated she gets drowsy when she takes her pain medications, and that she takes them every 12 hours." Tr. 37. The ALJ determined that a "review of the record shows that the claimant's medications have been generally effective in treating her conditions but not necessarily eliminating all symptoms. Treatment notes do not show any significant reported medication side-effects." *Id.*

As noted above, an ALJ is not required to specifically discuss every piece of evidence in the record. With regard to side effects from medication, Plaintiff references her testimony at the administrative hearing; but she does not point to any notations in her medical records that indicate she was experiencing medication side effects. In her Reply Brief Plaintiff argues that "the ALJ never mentions any particular medications required by the Plaintiff." Pl.'s Reply 3, ECF No. 18. This is an incorrect statement. In his decision the ALJ stated:

> The claimant has reported taking various medications at times of Estradiol, Phentermine, Lasix/Furosemide as a diuretic, Prozac, Vistaril, diclofenac sodium for arthritis, Maxzide, atenolol for high blood pressure, Pepcid/Famotidine for acid reflux, Topiramate for mood disorders, Hydrochlorothiazide as a diuretic, Venlafaxine for anxiety, Hydroxyzine for anxiety, Norco for pain, Potassium, and Prazosin for high blood pressure (Exhibits 12E, 15E, 16E and 17E).

Tr. 37. Not only did the ALJ discuss Plaintiff's medications and their reported side effects, the ALJ also discussed Plaintiff's daily activities. This is another factor to be considered in evaluating the effects of an individual's symptoms. SSR 16-3p, 2016 WL 1119029 at *7 (citing 20 C.F.R. §

404.1529(c)(3)). The ALJ noted Plaintiff's hearing testimony where she "reported doing a little bit of dishes, vacuuming, and laundry. With getting dressed and bathing, the claimant reported [her] husband helps her shave and getting dressed because she can't lift her right arm." Tr. 37. Earlier in his decision the ALJ discussed information from Plaintiff's consultative examination in April 2015, less than two weeks after her date last insured of March 31, 2015. Tr. 29. The ALJ noted at that examination "claimant reported being able to dress and feed herself. The claimant reported other activities of daily living including driving for up to two hours without significant discomfort, and performing most household chores including sweeping, mopping, vacuuming, and cooking. The claimant reported occasionally shopping." *Id.*

The court finds that the ALJ acknowledged Plaintiff's hearing testimony and properly considered the evidence of record—including her medications and medication side effects—and dismisses this allegation of error.

### 2. The ALJ's RFC Determination

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*. *Id.* (emphasis in original). At the administrative hearing level, the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4).

Here, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work[5] with additional limitations. Tr. 35, 39. The limitations included:

> Alternating to standing for up [to] 10 minutes after 30 minutes of sitting; can occasionally reach overhead and all other directions on the right; handling and fingering objects frequently on the right; can occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; no work requiring far acuity; no work involving clear verbal skills such as telephone use; with moderate exposure to noise; and jobs limited to simple routine tasks.

Tr. 35. The ALJ stated that in making this finding he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." Tr. 35-36. The ALJ noted that he also considered the opinion evidence in accordance with 20 CFR 404.1527. Tr. 36. The ALJ discussed Plaintiff's testimony describing her impairments and activities, her medications, and findings of fact made by the State agency medical and psychological consultants. The ALJ concluded that "when considering the objective medical evidence, including limited abnormal clinical findings and diagnostic testing, the claimant was

---

[5] SSR 96-9p defines sedentary work as follows:

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

SSR 96-9p, 1996 WL 374185 at *3 (July 2, 1996).

able to perform a variety of work from her alleged onset date through her date last insured." Tr. 37-38.

Plaintiff contends that in formulating his RFC assessment the ALJ failed to consider her required use of a cane; the limitations in her ability to use her dominant right shoulder, hand, and arm; and her bilateral hearing loss. Pl.'s Br. 15-21. The Commissioner argues that the ALJ appropriately considered these limitations. Def.'s Br. 7-11.

### a. Plaintiff's Use of a Cane

Plaintiff asserts that on April 29, 2015, her treating physician prescribed her a cane for pain and limited mobility, but actually wrote the prescription on June 29, 2015. Pl.'s Br. 15. Plaintiff notes that "[a]t that time, she suffered from documented bilateral knee impairments, chronic knee pain, generalized pain and obesity." *Id.* at 15-16. Plaintiff argues that despite the fact that the cane was not prescribed until June 2015, her need for a cane existed prior to that time; and, despite the lack of imaging of her knees, "the record is replete with documentation of chronic bilateral knee pain with evidence of her knees clicking and popping and giving way." *Id.* at 16. Plaintiff also asserts "[m]ost importantly, [her] weight is consistently in excess of 300 pounds." *Id.*

### (1) Medical Records

As part of a Disability Determination Exam, on April 11, 2015, Dr. Michael Kanwisher of Med Plus SC completed an Internal Medicine Examination of Plaintiff to address her allegations of 80% bilateral hearing loss, vision problems, obesity and hypertension, and right knee and right shoulder pain. Tr. 439-43. Regarding her walking, after examination Dr. Kanwisher noted that Plaintiff had "no abnormalities of gait, somewhat slow ambulation, but no significant notable limp, minimal trouble getting on and off exam table, and up and out of chair." Tr. 441. Specifically, with

regard to her extremities he noted: "Gait is slow, but no obvious limp, no assistive device used for ambulation." Tr. 442. His impression in conclusion was:

> Regarding knee pain, the patient does have suspected arthritic degeneration in her right knee. The patient has diminished range of motion and significant discomfort with manipulation. As a result of her significant knee discomfort, I do think this would be problematic for anything requiring prolonged standing, walking, or lifting.

Tr. 443.

Based on medical records received from Rural Health Services of Aiken, Plaintiff was examined on April 29, 2015 by Family Nurse Practitioner ("FNP") Samantha Parkinson. Tr. 461. Plaintiff was being seen for medication refills and "to get disabled placard applications filled out. [Patient] states she has fallen 3 times in the past month." *Id.* FNP Parkinson assessed Plaintiff with morbid obesity, knee joint pain, and generalized pain. Tr. 462. Her plan included giving Plaintiff a handicap placard "for 12 months due to orthopedic issues, pain and limited mobility without assistive aids." *Id.* On June 29, 2015, FNP Parkinson prescribed a "walking cane" based on the diagnosis of "weak/painful knees." Tr. 461.

On July 20, 2015, Dr. Mark Taylor completed an Obesity Questionnaire about Plaintiff. Tr. 457. He noted that Plaintiff was 5'2" tall, weighed 327 pounds, and had bilateral knee pain. In response to a question that asked if the patient's obesity significantly affected her ability to walk and stand, Dr. Taylor responded: "Yes. Uses cane to alleviate pain." *Id.*

### (2) ALJ's Consideration of Relevant Evidence

In his discussion of Plaintiff's severe impairments, the ALJ noted that "[a]t all times during the period in question, the claimant has been obese" and found it "reasonable to conclude that the claimant has related work restrictions at this level of obesity." Tr. 28. The ALJ stated that he considered Plaintiff's obesity in determining her RFC. *Id.* Regarding Plaintiff's musculoskeletal

complaints the ALJ noted that treatment for those complaints "has been conservative and limited to routine office visits with her primary care providers, and medications and injections during the period in question. Physical exams have also been normal or nearly normal during this time as well. Rather than advise the claimant to limit her activities, the claimant has been counseled about weight loss and appropriate exercise (Exhibits 7F and 15F)." Tr. 29. The ALJ cited to Dr. Kanwisher's April 2015 consultative exam and noted that the doctor reported Plaintiff did not use an assistive device. *Id.* Specifically discussing the use of a cane, the ALJ stated:

> In June 2015, three months after the claimant's date last insured, she was prescribed a walking cane due to weak/painful knees (Exhibit 15F, page 4). In July 2015, nearly four months after the claimant's date last insured, Dr. Taylor completed an Obesity Questionnaire . . . . Dr. Taylor indicated the claimant's obesity significantly affects her ability to walk and stand, and that she uses a cane to alleviate pain (Exhibit 14F).
>
> I have given partial weight to Dr. Taylor's questionnaire concerning the claimant's use of a cane. Although the claimant was prescribed a cane in June 2015, it was prescribed three months after her date last insured. Treatment notes during the period in question do not show any significant difficulties with ambulation, strength, or balance. Treatment records do not show the need for an assistive device, or that the claimant used an assistive device, through her date last insured. In fact, at the April 2015 consultative examination, which was completed less than two weeks after the claimant's date last insured, she had slow ambulation, but no gait abnormalities, and she did not use an assistive device. The claimant was able to walk on her heels, toes, and perform heel-to-toe; and she had normal motor strength of 5/5 in all four extremities.

Tr. 30. The ALJ stated that he accounted for Plaintiff's knee conditions and obesity in the RFC. *Id.*

### (3) Discussion

SSR 96–9p explains the SSA's policies regarding the capability of a claimant to do other work when, as here, the claimant has an RFC for less than the full range of sedentary work. Regarding exertional limitations, the Ruling provides:

To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand.[7] For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

[7] Bilateral manual dexterity is needed when sitting but is not generally necessary when performing the standing and walking requirements of sedentary work.

1996 WL 374185, at *7.

It is the claimant's burden to prove evidence of disability. *Hall v. Harris*, 658 F.2d at 264-65. Plaintiff argues that the ALJ's finding that her cane was not prescribed until after her date last insured is not impactful because her need for a cane existed prior to the prescription. Pl.'s Br. 16. Plaintiff cites to *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010) to support the argument that a prescription for a cane is not required. *Id.* In *Parker*, the court reflected on the fact that the ALJ "thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A

cane does not require a prescription; it had been suggested to the plaintiff by an occupational therapist." *Parker v. Astrue*, 597 F.3d at 922. However, "[g]iven the fact-specific nature of the ALJ's inquiry, neither a prescription for a cane, nor the lack thereof, necessarily determines whether the claimant medically requires an assistive device." *Helms v. Berryhill*, No. 3:16CV189(MHL), 2017 WL 3038154, at *8 (E.D. Va. June 30, 2017), *report and recommendation adopted,* No. 3:16CV189 (MHL), 2017 WL 3032216 (E.D. Va. July 17, 2017); s*ee also Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) ("The legal issue does not turn on whether a cane was 'prescribed' . . . but whether a cane was 'medically required.'").

In her Reply, Plaintiff cites to the first prong in SSR 96-9p for finding that a hand-held assistive device is medically required—the need for medical documentation establishing the need—and asserts she has met that requirement. Pl.'s Reply at 5. However, Plaintiff fails to discuss the second prong—documentation providing a description of the circumstances for which the device is needed. Plaintiff provides no documentation of the necessity of a cane during the relevant period, or under what circumstances she would have to use it. "Though the record does indeed indicate that Plaintiff uses a cane . . . nothing indicates that it is 'required' within the meaning of the Social Security Rulings or relevant decisions. As such, the ALJ was not required to make any particular assessments regarding Plaintiff's use of a cane in formulating the RFC." *Joines v. Colvin*, No. 3:14-CV-00396-MOC, 2015 WL 1249579, at *6 (W.D.N.C. Mar. 18, 2015) (internal citations omitted). "Plaintiff fails to cite any law requiring an ALJ to consider the impact of a device that a Plaintiff is not medically required to use. Because there is no evidence showing that the cane is medically required or law requiring an ALJ to consider the impact of a non-required device, the ALJ did not err" in failing to discuss the medical necessity of a cane or include any cane-related limitation in his RFC assessment. *Timmons v. Colvin*, No. 3:12CV609, 2013 WL

4775131, at *8–9 (W.D.N.C. Sept. 5, 2013). Based on the record the ALJ could have properly concluded that the use of an assistive device was not medically required during the relevant period and would not impact his RFC determination.

b. Limitations in Use of Right Shoulder, Hand, and Arm

Plaintiff contends that "the ALJ did not take into consideration the limitations in the Plaintiff's ability to utilize her dominant right shoulder, hand and arm. She suffers from a well-documented right shoulder impairment which affects her ability to use her right hand/arm in reaching even to shoulder level or above, as well as handling and fingering." Pl.'s Br. 16-17. The Commissioner argues that the ALJ's RFC findings regarding lifting, reaching, handling, and fingering are supported by Plaintiff's testimony and her self-reporting regarding her abilities. Def.'s Br. 9.

(1) Medical Records

Medical records received from Rural Health Services indicate Plaintiff was seen on December 20, 2010[6] for various complaints including right shoulder pain. Tr. 493. Plaintiff reported the shoulder pain was "of 3-4 years duration" and she had "been told that it was due to rotator cuff and had received a cortisone shot with short term relief." Tr. 494. An x-ray of Plaintiff's shoulder was completed on January 20, 2011, and Plaintiff stated that "her right shoulder is a little better." Tr. 492. The notes indicate that on examination Plaintiff was "only able to raise the arm to horizontal position." Tr. 493. She was given a prescription for Motrin for daily use and Lorcet to take as needed. *Id.* Plaintiff returned on June 27, 2011 stating that her right shoulder was hurting and "stiffening up on her." Tr. 487. Physical examination found abnormal

---

[6] Records pre-dating Plaintiff's disability alleged onset date of December 3, 2013 are discussed herein to provide background information and context. The court notes that Plaintiff did not stop working until her alleged onset date. Tr. 210.

motion in the right shoulder and noted that Plaintiff was "unable to raise the right arm to horizontal and pain was elicited in the shoulder by motion." Tr. 488. Plaintiff was prescribed Sterapred DS for six days and Lorcet Plus for the "next couple of day[s]." *Id.* It was recommended that she "give the pushing, pulling, and lifting a break until this flare up resolves." *Id.* Plaintiff returned on August 16, 2011, complaining of exorbitant right shoulder pain that limited her use of that arm and shoulder. Tr. 485. Plaintiff was given an injection in her shoulder joint and "had much improved [range of motion ("ROM")], passively, and less pain thereafter." Tr. 487. Plaintiff was instructed "to use the shoulder and put it through ROM maneuvers to keep it from adhesing." *Id.*

On July 19, 2012, Plaintiff reported "pain/popping in her right shoulder." Tr. 475. Her right shoulder was examined and there was tenderness on palpation. Tr. 477. She was assessed with "likely tendinitis." *Id.* On November 16, 2012, Plaintiff reported "some right shoulder tenderness that is relieved with a certain exercise in the gym." Tr. 473.

On March 15, 2013, Plaintiff was seen in the emergency department of Aiken Regional Medical Center complaining of right shoulder pain after falling out of the bathtub. Tr. 382. Plaintiff was assessed with diffuse tenderness in the right shoulder, mild tenderness in the right elbow, and full ROM in her wrist and hand with no pain. Tr. 383. Findings from the shoulder x-ray indicate "severe degenerative changes in the glenohumeral joint. Cortical irregularity is seen at the humeral head, likely due to degenerative changes. No definite displaced fracture is seen." Tr. 385. However, the emergency department physician record indicates Plaintiff was diagnosed with a "closed fracture of the humerus" and a sling and prescription of Norco was ordered. Tr. 384. Plaintiff was discharged to home in stable condition. *Id.*

In his April 2015 consultative examination, Dr. Kanwisher noted on examination that Plaintiff's grip strength was "4+/5 on the right and 5/5 on the left suspected secondary to

discomfort in the right upper extremity." Tr. 442. He noted decreased ranges of motion in the right shoulder compared to the left shoulder and stated that Plaintiff "does appear to have some degree of possibly frozen shoulder or AC impingement." *Id.* In his concluding impression Dr. Kanwisher stated:

> Right shoulder pain appears to be possibly AC impingement, although I failed injection treatment of this and also behind the differential is frozen shoulder, especially with impingement very poor external rotation ability. This should eventually improve, but this is a very slow process. This also could be arthritic and would recommend imaging of the shoulder to further work up of this.

Tr. 443.

### (2) ALJ's Consideration of the Relevant Evidence

The ALJ considered the limitations related to Plaintiff's right shoulder in his Decision. In his discussion of Plaintiff's impairments, the ALJ discussed the records outlined above. Tr. 29. In formulating his RFC assessment, the ALJ stated the following:

> Due to major joint dysfunction of the right shoulder, I find that the claimant had the ability to lift no more than 10 pounds at a time; with occasional lifting or carrying articles (as described above)[7]; can occasionally reach overhead and all other directions on the right; and can handle and finger objects frequently on the right.

Tr. 35. The ALJ also cited to Plaintiff's hearing testimony where she stated that her husband has to help her shave and with getting dressed because she cannot lift her right arm, and that she reported her right hand is weak. Tr. 37.

### (3) Discussion

Plaintiff asserts that the "objective evidence supports the limitations in reaching and using her right arm and hand as testified to by the Plaintiff" and that all of the jobs identified by the VE "require reaching and handling beyond the abilities of the Plaintiff." Pl.'s Br. 17. The

---

[7] The ALJ is referring to his RCF assessment that provided the examples of "docket files, ledgers, or small tools" as articles Plaintiff could lift and carry. Tr. 35.

Commissioner argues that the ALJ's RFC finding "is supported by Plaintiff's testimony that she had no difficulty using her right arm to reach straight out in front of her (Tr. 67). Plaintiff reported no problems using her left arm (Tr. 61)." Def.'s Br. 9.

SSR 96-9p defines a nonexertional limitation as "an *impairment-caused* limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling." 1996 WL 374185 at *5 (emphasis in original). Regarding manipulative limitations, the Ruling provides the following:

> Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. . . . When the limitation is less significant, *especially if the limitation is in the non-dominant hand*, it may be useful to consult a vocational resource.

*Id.* at *8 (first emphasis in original; second emphasis added). SSR 85-15 clarifies how the regulations and the Medical-Vocational Rules provide a framework for decisions when a claimant has only nonexertional limitations. 1985 WL 56857 at *1. The ruling notes that "[s]ignificant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a [vocational expert] may be needed to determine the effects of the limitations." *Id.* at *7.

Here, Plaintiff testified that she is left-handed and had no problems with her left arm. Tr. 61. Therefore, the issues with her right shoulder and arm are in her non-dominant extremity. Plaintiff stated that she could not lift her right arm over shoulder level, but she had no problems lifting it straight out in front of her. Tr. 60-61, 67. The ALJ consulted a VE to assist him in

formulating his RFC. At the administrative hearing, the ALJ posed a hypothetical to the VE asking about the availability of jobs if an individual with the same vocational background as Plaintiff could, in addition to other limitations, "occasionally reach overhead and all other directions on the right. Handling and fingering objects would be frequent on the right." Tr. 70. The VE testified that although the individual would be unable to perform Plaintiff's past work, there would be jobs available and the VE identified three exemplar positions of assembler, machine tender, and bench hand or packer. Tr. 71. The VE noted that the DOT does not "break down *those* reaching restrictions for one hand versus bilaterally" and stated that portion of his testimony was based on his experience in the field of rehabilitation counseling. Tr. 71-72 (emphasis added). Plaintiff's counsel did not ask the VE any questions regarding reaching. *See* Tr. 72-80.

As Plaintiff argues, the jobs identified by the VE indicate that reaching is required either frequently (*see* assembler position, DOT 739.684-094, at 1991 WL 680137; machine tender position, DOT 731.685-014 at 1991 WL 679811 ) or constantly (*see* bench hand position, DOT 715.684-026, 1991 WL 679344). Thus, there is an apparent conflict between the DOT and the VE's testimony regarding available jobs with the limitations of occasional reaching with the Plaintiff's non-dominant arm.

Pursuant to SSR 00–4p, an ALJ has a duty to elicit an explanation from the VE as to any "apparent unresolved conflict" between the VE's testimony and the DOT:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is such consistency.

SSR 00–4p, 2000 WL 1898704, at *2.

Here, this conflict was resolved with the VE's testimony that although the DOT does not address the issue regarding unilateral reaching restrictions, his finding was based on his professional experience. At Step Five in his Decision the ALJ stated that Plaintiff's ability to perform the full range of sedentary work was impeded by additional limitations. The ALJ relied on the VE to determine what jobs would be available:

> To determine the extent to which these limitations erode the unskilled sedentary occupational base, through the date last insured, I asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as assembler (DOT# 739.684-094), that is sedentary and unskilled with a SVP of 2, of which there are 350,000 jobs in the national economy; machine tender (DOT# 731.685-014), that is sedentary and unskilled with a SVP of 2, of which there are 275,000 jobs in the national economy; and bench hand (DOT# 715.684-026), that is sedentary and unskilled with a SVP of 2, of which there are 84,000 jobs in the national economy.

Tr. 39. The ALJ then considered whether the VE's testimony was consistent with the information contained in the DOT and determined:

> While the [DOT] does not specifically address all of the limitations in the claimant's residual functional capacity, the testimony of the vocational expert, which is based on his knowledge and personal observations, expands the description provided in the [DOT]. Thus, I find that the testimony is not inconsistent with the [DOT].

Tr. 39. As discussed above, the VE's testimony reflects that he considered the ALJ's reaching limitations, he acknowledged that the DOT did not differentiate between unilateral and bilateral reaching as it related to those limitations, and he was relying on his own professional experience to opine that an individual restricted to occasional reaching on the right could perform the three jobs he identified. Accordingly, Plaintiff's allegation of error fails. *Allen v. Berryhill*, No.

1:17CV277, 2018 WL 2025666, at *6 (M.D.N.C. May 1, 2018) (finding ALJ complied with SSR 00-4p by "eliciting a reasonable explanation from the VE for the apparent conflict in question").

c.  Bilateral Hearing Loss

Plaintiff asserts that the ALJ erred by failing to properly account for her bilateral hearing loss in formulating the RFC assessment. Pl.'s Br. 19. The Commissioner contends that the ALJ appropriately considered Plaintiff's bilateral hearing loss. Def.'s Br. 10.

(1) Medical Records

On March 20, 2007, audiologist, Dr. Mark B. Little of Hearing Associates of South Carolina conducted an Audiologic Evaluation of Plaintiff upon referral from Vocational Rehabilitation Services. Tr. 315. Plaintiff told Dr. Little that she was born with bilateral hearing loss and while she used hearing aids as a child, she has not used them for over 30 years. *Id.* Dr. Little provided a Professional Certification Form indicating that he certified Plaintiff with the permanent disability of "Hard of Hearing." Tr. 314. Dr. Little noted: "Profound hearing loss in mid to high pitches with very poor speech discrimination even with amplification; would significantly benefit from captioned phone (try first, but may even need TTY later) & alerting devices." *Id.* Dr. Little provided a Hearing Disability Report recommending programmable digital behind-the-ear hearing aids. Tr. 313. He also noted that "even with the hearing aids, hearing will be difficult so jobs requiring good hearing (receptionist, waitress, use of phone) would be difficult. Also, any job in hazardous noise levels should be closely monitored to ensure she has properly fitted hearing protection." *Id.* Dr. Little wrote a letter to Vocational Rehabilitation Services requesting the hearing aids and asking for authorization to procure the hearing aids and earmolds. Tr. 312.

On March 26, 2015 Dr. Rocco D. Cassone evaluated Plaintiff for decreased hearing. Tr. 430. As part of Plaintiff's history, he noted that Plaintiff "has worn hearing aids in the past and would probably benefit from considering amplification. She does read lips well." *Id.* He noted that Plaintiff was sent for an audiogram and it showed a profound hearing loss. Dr. Cassone recommended that Plaintiff "should be consider[ed] disabled because of her hearing loss. Amplification would help her. She could consider cochlear implantation though she is not interested in this at this time." *Id.*

Audiologist Ronald Lunn performed an audiological evaluation of Plaintiff on March 26, 2015 and provided his test results to the SC Vocational Rehabilitation Department and Disability Determination Department on April 7, 2015. Tr. 431-33. Lunn reported:

> [Plaintiff] is presently aided binaurally with MicroTech BTE hearing aids that are 7 to 8 years old. The hearing aids are reportedly in disrepair; and therefore, are not meeting her receptive communication needs. Test results suggest a bilateral, moderate to profound sensori-neural hearing loss. Speech discrimination ability appeared to be poor, with scores of 62% at the right ear and 68% at the left ear.

Tr. 431. Lunn recommended Plaintiff "be seen for follow-up to explore the benefits of a new system of amplification pending otologic approval." *Id.*

Dr. Kanwisher considered Plaintiff's hearing loss as part of his April 11, 2015 examination. In his discussion of Plaintiff's medical history, he provided the following information regarding Plaintiff's hearing:

> The patient is a 47-year-old female who was born with significant hearing loss bilaterally. The patient has always had worst hearing on the left side than the right side, but her right side of hearing has been worsening over the last few years. The patient has seen a few different otolaryngologists, one recently in Orangeburg, who she cannot recall the name of and has previously seen Dr. Little in Aiken 4 or 5 years ago. The patient was given previously hearing aids for both ears, but this improved her hearing very minimally. The patient has had no surgical procedures performed on either ear. The patient is told that there is significant scar tissue in the left ear that cannot be removed and this has been this way since birth. The patient was recently told by the otolaryngologist in Orangeburg that she could be a

candidate for cochlear implant on the right side and her and her husband are presently looking into this. As a result of her hearing, the patient has learn[ed] how to sign and read lips. The patient is able to speak fairly well, but does have abnormal phonic sound.

Tr. 439. On physical examination Dr. Kanwisher noted that Plaintiff "is able to read lips well, although her hearing is very poor with very little hearing bilaterally. The patient is able to follow along with conversation exam questions, but no significant difficulty and very few repetitions are required." Tr. 441. Dr. Kanwisher concluded:

Regarding hearing loss, the patient has had significant hearing loss since birth. The patient does read lips very well and was very easy overall to communicate with throughout examination. The patient nevertheless does have some disadvantage with most activities of daily living and job-related functions as a result of this. The patient may benefit from cochlear implant as previously suggested.

Tr. 443.

Audiologist Lunn evaluated Plaintiff again on May 1, 2017. Tr. 528-30. He noted:

The patient arrived today without amplification. Test results suggest a bilateral, moderate to profound hearing loss. Speech Reception Thresholds could not be obtained nor speech discrimination ability, bilaterally, as the patient remained unresponsive; however, Speech Awareness Thresholds were obtained at levels that appeared to be consistent with the pure tone audiometrics.

Tr. 528. Lunn indicated that Plaintiff "would be considered a candidate for the use of amplification." *Id.*

Following the evaluation, Dr. Cassone examined Plaintiff and noted in her history that Plaintiff "has a known hearing loss and is disabled because of this. She has significant problems understanding people on the phone." Tr. 527. Dr. Cassone recommended that Plaintiff be "considered for amplification" and indicated that she "may be a candidate for a cochlear implant but is not interested in this at this time." *Id.*

### (2) ALJ's Consideration of the Relevant Evidence

The ALJ discussed all of the above medical evidence in his Decision. Tr. 29-33. The ALJ gave partial weight to Dr. Little's 2007 conclusions regarding work restrictions noting that

"[w]hile his conclusions are consistent with the claimant's hearing loss, the testing was completed several years prior to the claimant's alleged onset date." Tr. 31. The ALJ gave "little to no weight to Dr. Cassone's statement that the claimant should be considered disabled because of her hearing loss." *Id.* The ALJ noted that Dr. Cassone did not specify any actual work limitations and his statement that Plaintiff was disabled was contradicted by his statements that Plaintiff reads lips well and communicates well when she read lips. *Id.* The ALJ also noted:

> Furthermore, none of the claimant's treating providers has noted any significant difficulty with the claimant's hearing during office visits. As previously discussed, the State agency documented eight separate telephone conversations in 2015 in which the claimant showed no evidence of communicative difficulty (Exhibit 5A, pages 8-9). In addition, the claimant also had no unusual difficulty in participation in the hearing. She was able to listen and respond appropriately to questions.

Tr. 31. The ALJ discussed Plaintiff's 2017 hearing evaluations with Lunn and Dr. Cassone. Tr. 32-33. The ALJ again gave "little to no weight to Dr. Cassone's statement that the claimant is disabled and to this audiologic evaluation." Tr. 33. The ALJ noted that "Dr. Cassone did not specify any actual work limitations" and also noted that the "evaluation was completed over two years after the claimant's date last insured, which makes it too remote to the period in question." *Id.*

In formulating his RFC assessment, the ALJ provided the following limitation: "Due to hearing loss, I find that the claimant was restricted from work involving clear verbal skills such as telephone use, and was limited to moderate exposure to noise." Tr. 35.

The ALJ also discussed Plaintiff's hearing testimony that her hearing was getting worse, she did not wear hearing aids because she was told that they would not help her, and she does not drive much because she is unable to hear sirens and other cars. Tr. 36. The ALJ questioned why Plaintiff "would make the statement that hearing aids would not help her because at the hearing

evaluations in March 2015 and May 2017, Dr. Cassone specifically stated that amplification would help her (Exhibit 10F, page 2; and 20F, page 2)." *Id.*

(3) Discussion

Regarding hearing impairments SSR 85-15 provides:

> Communication is an important factor in work. The inability to hear, because it vitally affects communication, is thus of great importance. However, hearing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss. Occupations involving loud noise, such as in printing, have traditionally attracted persons with hearing impairments, whereas individuals with normal hearing have to wear ear protectors to be able to tolerate the working conditions. On the other hand, occupations such as bus driver require good hearing. There are so many possible medical variables of hearing loss that consultation of vocational reference materials or the assistance of a [vocational specialist] is often necessary to decide the effect on the broad world of work.

SSR 85-15, 1985 WL 56857 at *7. In this case the ALJ consulted a VE regarding available jobs for an individual with Plaintiff's limitations—including hearing loss—and the VE testified as to jobs such a person could perform. Tr. 70-71. Plaintiff's counsel questioned the VE extensively regarding the verbal skills and communication deficits as they related to the identified jobs. The VE testified that the cited jobs did not "require ongoing communication on a regular basis" and beyond the initial training phase, the ability to hear was "just not going to be an essential function." Tr. 72-73.

As noted in SSR 96-9p: "Basic communication is all that is needed to do unskilled work. The ability to hear and understand simple oral instructions or to communicate simple information is sufficient. If the individual retains these basic communication abilities, the unskilled sedentary occupational base would not be significantly eroded in these areas." 1996 WL 374185 at *8.

Plaintiff questions why the ALJ would order Dr. Cassone's 2017 evaluation "and then refute its findings based on remoteness or vagueness, when actually, the audiogram shows

significant bilateral hearing loss and is consistent with the findings in the prior audiograms." Pl.'s Br. 21. The timing of the evaluation was only part of the ALJ's reasoning for giving the evaluation little to no weight. The ALJ noted that Dr. Cassone did not provide any specific work limitations and made a blanket statement as to disability without providing any analysis. Tr. 33. The ALJ specifically stated:

> In evaluating the evidence, I have recognized that the claimant's conditions and symptoms may have recently worsened. However, I am bound by requirements of the Social Security Act in determining whether the claimant meets the definitions of disability, including consideration of her date last insured to the medical evidence. Unfortunately, in relation to the claimant's Disability Insurance Benefits application, her earnings record shows that she was only insured through March 31, 2015.

*Id.* The court finds that the ALJ's RFC determination related to Plaintiff's bilateral hearing loss is supported by substantial evidence.

In sum, the ALJ explained how the objective evidence he cited supports his RFC assessment that Plaintiff is capable of performing the requirements for a limited range of sedentary work.

### 3. ALJ's Evaluation of Plaintiff's Mental Impairments and Limitations

In her final allegation of error, Plaintiff argues the ALJ failed to "properly and adequately evaluate the mental impairments and mental limitations of the Plaintiff." Pl.'s Br. 21. The Commissioner contends that the ALJ adequately considered Plaintiff's depression and anxiety. Def.'s Br. 11.

The regulations provide steps that must be applied in evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The ALJ must follow a "special technique" to determine the severity of a claimant's mental impairments. 20 C.F.R. § 404.1520a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to substantiate the

presence of a medically determinable mental impairment. *Id.* § 404.1520a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. *Id.* § 404.1520a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. *Id.* § 404.1520a(d). The ALJ considers four broad functional areas in order to rate a claimant's degree of functional limitation: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* § 404.1520a(c)(3); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C. The ALJ considers factors such as "the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [claimant] require[s], and the settings in which [the claimant is] able to function." *Id.* § 404.1520a(c)(2); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C–H. The ratings for the functional areas consist of a five-point scale: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). SSR 96-8p provides that in assessing a claimant's mental RFC the ALJ should consider "[w]ork-related mental activities generally required by competitive, remunerative work [which] include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." 1996 WL 374184, at *6.

At Step Two of the sequential evaluation process the ALJ determined Plaintiff had the severe impairment of depressive disorder and anxiety disorder. Tr. 27. The ALJ noted that treatment notes from Rural Health Services of Aiken indicated the Plaintiff "was diagnosed with depression in June 2011 and seasonal pattern depression in August 2011 (Exhibit 15F, pages 29 and 33). Other treatment notes from this provider during the period in question show limited complaints of mental symptoms and typically normal mental exams (Exhibits 7F and 15F)." Tr.

31. The ALJ cited to the findings made by Dr. Mark Taylor, one of Plaintiff's primary care physicians. Tr. 32. On March 26, 2015 Dr. Taylor completed a questionnaire regarding Plaintiff's mental condition. Tr. 425. He indicated Plaintiff's diagnosis was depression with anxiety and she had been prescribed Prozac and Vistaril which helped her condition. *Id.* He indicated Plaintiff had "appropriate" thought content, "normal" mood/affect, "good" attention/concentration, and "good" memory. *Id.* Considering Plaintiff's mental impairments, Dr. Taylor opined that Plaintiff had "good" (as opposed to "adequate" or "poor") ability to complete basic activities of daily living; to relate to others; to complete simple, routine tasks; and to complete complex tasks. *Id.* Dr. Taylor commented that he was "unaware of any limitations due to mental condition." *Id.*

The ALJ gave Dr. Taylor's conclusions partial weight and noted that treatment notes during the period in question did show some mental complaints. Tr. 32. The ALJ also cited to records from Aiken Barnwell Mental Health dated June 2016, three months after Plaintiff's date last insured. *Id.* In those records Plaintiff reported symptoms including depression, anxiety, anger, and suicidal ideation and reported that her medications were not helping. *Id.* The ALJ noted that Plaintiff was placed on a different medication—Effexor—and was discharged from the mental health center in November 2016 due to her dropping out of services. However, records indicated Plaintiff was stable at last contact in November 2016. *Id.*

At Step Three the ALJ determined that the "severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings including Listings 12.04 and 12.06." Tr. 34. As required by the regulations, the ALJ documented application of the special technique by incorporating pertinent findings and conclusions as to the degree of limitation in each of the functional areas. *Id.* The ALJ found Plaintiff had mild limitation in the area of understanding, remembering, or applying information. The ALJ noted that

"[t]roughout the record, from the claimant's alleged onset date through her date last insured, she has had normal or nearly normal mental exams at office visits." *Id.* The ALJ determined Plaintiff had moderate limitation in interacting with others and noted that Plaintiff demonstrated the ability to get along with her treating providers and indicated in her Function Report that she is able to go out alone, shop, and spend time with others. *Id.* The ALJ determined Plaintiff had mild limitation with regard to concentration, persistence or maintaining pace and noted:

> The claimant has reported activities that require concentration, persistence, and/or pace including preparing lunch, household chores including loading and unloading the dishwasher, cleaning the sink and toilet, driving, shopping, paying bills, counting change, and using a checkbook/money orders (Exhibit 6E). At the hearing, the claimant reported activities including some driving.

*Id.* As to the last functional area, the ALJ determined Plaintiff had moderate limitation in the area of adapting or managing oneself. *Id.* The ALJ noted that "medical records have shown that the claimant maintains her hygiene and attire, that she has regulated her emotions, and that she has controlled her behavior during office visits. The medical records have also shown that the claimant has demonstrated the ability to get along with her treating providers and other medical staff." *Id.* The ALJ concluded his special technique assessment by stating that the limitations he identified are not an RFC assessment but are used to rate the severity of mental impairments, and that his RFC assessment reflects the degree of limitation he found in the mental functional analysis. Tr. 35.

In his RFC assessment the ALJ determined that "[d]ue to the claimant's mental impairments, I find that she was limited to jobs with simple routine tasks." Tr. 35. The ALJ discussed Plaintiff's hearing testimony where she "indicated she is doing ok with depression" and testified that "she has good days and bad days with her depression and anxiety." Tr. 36. The ALJ also discussed Plaintiff's testimony regarding a recent hospital trip "because she tried to hurt

herself" and testimony indicating that "she has not had those feelings since then." Tr. 36-37. The ALJ also noted Plaintiff's testimony that her medications have helped. Tr. 37. Further, in his RFC assessment, the ALJ cited to the findings made by the State agency psychological consultants who indicated Plaintiff "does not have any severe mental impairments (Exhibits 1A and 5A)." Tr. 37. The ALJ gave these conclusions "little weight because evidence received at the hearing level indicates mental conditions that affect the claimant's ability to perform work activities." *Id.*

"[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d at 1166 (citing *Sitar v. Schweiker,* 671 F.2d 19, 20–21 (1st Cir. 1982)). Here the ALJ considered the medical evidence and Plaintiff's testimony in making his mental functional assessment. The ALJ performed the special technique for assessing the severity of a claimant's mental impairments and adequately documented his evaluation of Plaintiff's mental impairments.

Citing *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) and its progeny, Plaintiff argues that remand is necessary because the ALJ's RFC finding does not account for her limitations in concentration, persistence, and pace. Pl.'s Br. 22-25. This case differs from *Mascio* in that *Mascio* dealt with "moderate" limitations in concentration, persistence, and pace, and here the ALJ determined Plaintiff had "mild" limitations. Under the regulations,"'[m]ild' difficulties are materially different from 'moderate' difficulties, in that 'mild' difficulties have little to no effect on a claimant's concentration, persistence, or pace and correspond to a finding that the difficulties do not significantly limit the claimant's mental abilities to do basic work activities." *Bailey v. Berryhill*, No. 517CV00165MOCDLH, 2018 WL 3939337, at *4 (W.D.N.C. Aug. 16, 2018) (citing 20 C.F.R. § 404.1520a(d)(1)); *Mohamed v. Berryhill*, No. 3:16CV821, 2017 WL 5474576, at *3 (W.D.N.C. Oct. 4, 2017), *report and recommendation adopted,* No. 3:16-CV-821, 2017 WL

5474056 (W.D.N.C. Nov. 14, 2017) (finding "the ALJ did not run afoul of *Mascio*, which addressed a finding by an ALJ that a claimant had <u>moderate</u> limitations in concentration, persistence, or pace at step three, not mild limitations.") (emphasis in original).

Here, the ALJ sufficiently addressed and accounted for Plaintiff's limitations and noted that Plaintiff "reported activities that require concentration, persistence, and/or pace . . . ." Tr. 34. The ALJ's analysis provided a logical bridge between the finding of mild limitations in concentration, persistence, and pace and his RFC determination through his discussion of the opinion evidence that indicated Plaintiff had no limitations due to a mental condition, Tr. 32, and by noting activities that support an ability to perform work-related activities, Tr. 34. *See Johnson v. Colvin*, No. 6:14-CV-3579-RBH, 2016 WL 462430, at *7 (D.S.C. Feb. 8, 2016) (finding no error in ALJ's omission of restrictions in RFC related to mild limitations in daily activities and social functioning where ALJ relied on "the activity assessment by the state agency physicians" and the claimant's testimony that he "played with his dogs, visits with his friends, and wallpapered his house").

Because, unlike in *Mascio*, Plaintiff's mental limitation in concentration, persistence, and pace was mild, and because the ALJ supported his RFC decision with sufficient detail, the court finds that there is substantial evidence to support the ALJ's final determination.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is

affirmed.

IT IS SO ORDERED.

Kaymani D. West
United States Magistrate Judge

February 11, 2020
Florence, South Carolina